IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAMION SCHINNERER,

    Plaintiff,

        v.

WELLSTAR HEALTH, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:22-CV-383-TWT

## OPINION AND ORDER

This is a False Claims Act case. It is before the Court on the Defendant Wellstar Health, Inc. ("Wellstar")'s Motion for Summary Judgment [Doc. 52]. As explained below, the Defendant Wellstar's Motion for Summary Judgment [Doc. 52] is GRANTED in part and DENIED in part.

## I.   Background[1]

This case involves the alleged retaliatory termination of the Plaintiff Damion Schinnerer's employment in violation of the False Claims Act ("FCA"). The Defendant Wellstar is a system of hospitals and other health care facilities. (Def.'s Statement of Undisputed Material Facts ¶ 1). Wellstar is a Medicare/Medicaid certified facility and accordingly must abide by the Centers for Medicare and Medicaid Services' ("CMS") promulgated regulations and

---

[1] The operative facts on the Motion for Summary Judgment are taken from the parties' Statements of Undisputed Material Facts and the responses thereto. The Court will deem the parties' factual assertions, where supported by evidentiary citations, admitted unless the respondent makes a proper objection under Local Rule 56.1(B).

related laws. (Pl.'s Statement of Undisputed Material Facts ¶ 9).[2] Wellstar hired Schinnerer in May 2020 for the position of Assistant Vice President ("AVP") of Biomedical Engineering. (Def.'s Statement of Undisputed Material Facts ¶ 2). In that position, Schinnerer was responsible for overseeing the Biomedical Engineering ("Biomed") Department, which involved working with Wellstar's Supply Chain Department to provide input regarding purchasing biomedical equipment and engaging vendors to service biomedical equipment. (*Id.* ¶ 3). Schinnerer also had responsibility for regulatory compliance. (*Id.* ¶ 4). In his position, four managers reported to Schinnerer, including one that was contracted. (Pl.'s Response to Def.'s Statement of Undisputed Material Facts ¶ 5). Those individuals included Curtis Ange, Chris Maier, Cecilia

---

[2] Wellstar argues that the entirety of Schinnerer's Statement of Undisputed Material Facts should be disregarded because it does not comply with Local Rule 56.1(B)'s requirement that the statement of facts be "concise." (Def.'s Response to Pl.'s Statement of Undisputed Material Facts, at 1-3). In support of its position, Wellstar relies on *Dinkins v. Leavitt*, 2007 U.S. Dist LEXIS 102709, at *9 (N.D. Ga. Dec. 17, 2007) *report and recommendation adopted*, *Dinkins v. Leavitt Secy*, 2008 U.S. Dist. LEXIS 1113 (N.D. Ga. Jan. 11, 2008). The court there disregarded a statement of facts by a pro se plaintiff who filed a 94-page document in response to the defendant's 25 statements of fact. The 94-page document was in narrative form, did not have individually numbered paragraphs, and never responded to the defendant's statement of facts. *Id.* at *7-9. The statement of facts here is 42 pages, contains numerated paragraphs, and need not address Wellstar's assertions as it is not a response to its statement of facts. The Court thus does not find that *Dinkins* provides support for disregarding the entire statement of facts. However, the Court agrees with Wellstar that a considerable number of statements in Schinnerer's Additional Statements of Material Facts are improper legal conclusions or immaterial, inadmissible, and/or impermissibly vague statements of fact. The Court will disregard all such statements.

Byers-Green, and Andre Anderson. (*Id.*). When Schinnerer was hired, he reported to Joe Braud, the Chief Technology Officer. (Def.'s Statement of Undisputed Material Facts ¶ 7). In 2021, the leadership of the Biomed Department was transitioning from Braud to Sandra Lucius. (Pl.'s Statement of Undisputed Material Facts ¶ 3). Schinnerer actively worked at Wellstar until May 18, 2021, when he was put on administrative leave. (*Id.* ¶¶ 191, 195). Then, his employment was officially terminated on October 1, 2021. (*Id.* ¶ 202).

Schinnerer contends that on several occasions during his employment at Wellstar, Wellstar did not select vendors based on competitive prices. (*Id.* ¶¶ 75, 77, 92, 98, 100, 120). Schinnerer further asserts that overspending directly impacts the cost of care. (*Id.* ¶ 97). However, Schinnerer does not know how Wellstar charges the government for the services it renders. (Def.'s Response to Pl.'s Statement of Undisputed Material Facts ¶ 97). Schinnerer reported his concerns about Wellstar overpaying for medical equipment to Braud, who told Schinnerer that either he needed to be able to prove it, he could call the ethics compliance hotline, or he should let it go. (*Id.* ¶ 148; Schinnerer Dep. at 29:12-20).

Schinnerer then called the ethics compliance hotline on April 20, 2021. (Pl.'s Statement of Undisputed Material Facts ¶¶ 148-49; Schinnerer Dep. at 29:17-20). When he initially called, he did so anonymously. (Pl.'s Statement of Undisputed Material Facts ¶ 150). Because the complaint involved the inappropriate conduct of senior leadership, the compliance analyst

3

immediately alerted Roshunda Drummond-Dye, the Vice President of Compliance and Chief Privacy Officer. (*Id.* ¶ 151). Within two weeks of receiving the complaint, Drummond-Dye informed Danyale Ziglor, Vice President of Human Resources, about the still-anonymous complaint. (Def.'s Response to Pl.'s Statement of Undisputed Material Facts ¶ 152).

In response to the complaint's allegations, Drummond-Dye interviewed individuals within the Supply Chain Department who had direct responsibility for the vendor selection process. (Pl.'s Statement of Undisputed Material Facts ¶ 174; Doc. 63-1 ("Exhibits to Wellstar Deps."), Ex. 10, at 3). Several interviewees discussed attempts or instances of circumventing the vendor selection process. (Pl.'s Response to Def.'s Statement of Undisputed Material Facts ¶ 52; Exs. to Wellstar Deps., Ex. 10 at 2). Compliance and Human Resources met on June 14, 2021 to wrap up the investigation. (Def.'s Statement of Undisputed Material Facts ¶ 52; Exs. to Wellstar Deps., Ex. 10 at 3). Based on the interviews and a review of relevant policies and documents, they concluded that there was no evidence to corroborate the allegations of the complaint, even though improvements could be made to the process. (*Id.*). At this point in time, Compliance and Human Resources did not know who submitted the complaint. (*See* Def.'s Statement of Undisputed Material Facts ¶¶ 51-53). However, Braud became aware in late May 2021 that Schinnerer submitted the complaint. (Pl.'s Statement of Undisputed Material Facts ¶ 154).

Then, on June 28, 2021, Schinnerer called Drummond-Dye, informed her that he was the one who submitted the complaint, and gave her additional information. (Def.'s Statement of Undisputed Material Facts ¶ 55; Exs. to Wellstar Deps., Ex. 10 at 3). Drummon-Dye continued investigating the allegations with the new information, but before that investigation was completed, Wellstar received a demand letter from Schinnerer's attorney on July 28, 2021. (Def.'s Statement of Undisputed Material Facts ¶ 75; Exs. to Wellstar Deps., Ex. 10 at 3-5). Since then, Wellstar's legal department has been directing the compliance investigation and views it as protected by attorney-client privilege. (Def.'s Statement of Undisputed Material Fact ¶ 76; Drummond-Dye Decl. ¶¶ 11-12).

Wellstar asserts that Schinnerer was mistreating other employees at the same time these events were taking place. During the months after Schinnerer began working for Wellstar, Braud received reports of Schinnerer treating team members in a disrespectful and abrasive manner. (Def.'s Statement of Undisputed Material Fact ¶ 8).[3] In response, Braud spoke with Schinnerer several times about engaging with team members and vendors in a respectful and collaborative way. (*Id.* ¶ 9). Braud never provided a written warning to Schinnerer about his behavior. (Def.'s Response to Pl.'s Statement of Undisputed Material Facts ¶ 221). After his discussions with Schinnerer,

---

[3] Wellstar's numeration in its Statement of Undisputed Material Facts repeats paragraph 8. This citation refers to the first paragraph 8.

Braud noticed some improvement in Schinnerer's interactions with team members, but Schinnerer would still revert back to his abrasive approach. (Def.'s Statement of Undisputed Material Facts ¶ 10). Braud discussed with Hank Capps, the Executive Vice President and Chief Information and Digital Officer, the need to address Schinnerer's abrasive engagement style through a performance improvement plan. (*Id.* ¶ 18; Capps Decl. ¶ 2).

On or about May 14, 2021, Braud called Director of Human Resources Donna Guydon to discuss Schinnerer, and Guydon told Braun that she was already investigating an incident involving Schinnerer and a Biomed employee named Lanard Harris. (Def.'s Statement of Undisputed Material Facts ¶¶ 19-20). Schinnerer had reported Harris to Human Resources because Harris used profanity towards Schinnerer during a virtual meeting. (*Id.* ¶ 21). In addressing the report regarding Harris, Guydon interviewed several Biomed team members who confirmed that Harris used profanity but also stated that they understood Harris's frustration given Schinnerer's intimidating and stress-inducing management style. (*Id.* ¶¶ 22-23). Harris's employment was terminated because of the inappropriate conduct towards Schinnerer. (*Id.* ¶ 27). Braud, Guydon, and Ziglor decided that, based on what was uncovered during the Harris investigation, Schinnerer's management style needed to be further investigated. (*Id.* ¶ 28).[4] Accordingly, Guydon

---

[4] Schinnerer disputes this fact in his Response to Defendant's Statement of Material Facts. However, Schinnerer simply provides a string of

interviewed several Biomed team members who regularly interacted with Schinnerer and reported issues with his abrasiveness. (*Id.* ¶ 30). Guydon, Ziglor, and Braud assert that they put Schinnerer on administrative leave so the Biomed team could speak freely about Schinnerer's behavior, and they contend that they terminated his employment based on the results of that investigation. (*Id.* ¶¶ 29, 41).

At the time Schinnerer's employment was terminated on October 1, 2021, Wellstar used a third-party company called WageWorks to send COBRA notifications. (*Id.* ¶ 87). A WageWorks employee with access to WageWorks's corporate records stated that the company sent Schinnerer his COBRA notification to 995 Tannery Court, Marietta, Georgia 30064 on October 12, 2021. (*Id.* ¶ 88; Fraser Decl. ¶¶ 3, 7). However, prior to his termination, Schinnerer sold his house at that address and had all mail forwarded to his parent's address in Fort Worth, Texas. (Def.'s Statement of Undisputed Material Facts ¶ 89). While he was on administrative leave, Schinnerer did not have access to the Wellstar system in order to change his listed address. (Pl.'s Statement of Undisputed Material Facts ¶ 265). Schinnerer called Human Resources to provide his new address around the end of August 2021. (*Id.* ¶¶ 265-66). Schinnerer did not receive his COBRA letter until months after his

_____

citations and does not explain what parts of this fact he is disputing or on what basis. Because of this failure to make a proper objection, this fact is deemed admitted under Local Rule 56.1(B)(2)(a)(2). Other responses with the same deficiencies will also be deemed admitted.

employment was terminated. (*Id.* ¶ 267; Def.'s Statement of Undisputed Material Facts ¶ 92).

Based on the foregoing facts, Schinnerer filed this lawsuit against Wellstar. After Wellstar's Motion to Dismiss was partially granted, two counts remain. First, Schinnerer asserts that Wellstar terminated his employment in retaliation for engaging in activity protected by the FCA. Second, Schinnerer argues that Wellstar failed to timely notify Schinnerer of his COBRA rights. Wellstar now moves for summary judgment on both counts.

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

### III.   Discussion

Wellstar contends that summary judgment should be granted on the FCA claim because he cannot show (1) that he engaged in any activity protected by the FCA, (2) that there is any causal connection between any protected activity and the decision to terminate his employment, and (3) that Wellstar's stated reason for terminating his employment was pretextual. (Def.'s Br. in Supp. of Mot. for Summ. J., at 7-22). Wellstar also argues that the record does not support emotional distress damages for Schinnerer's FCA claim. (*Id.*, at 22-23). With respect to Schinnerer's COBRA claim, Wellstar asserts that summary judgment is proper because Wellstar used reasonably calculated measures to ensure receipt of Schinnerer's COBRA notification. (*Id.*, at 23-24). The Court considers these arguments in turn.

### A. FCA Claim

The False Claims Act authorizes a private citizen, acting on behalf of the government, to file a civil action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)-(B). The False Claims Act also allows employees to seek relief from an employer where the employee "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of" protected activity, or "lawful

9

acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations" of the FCA. 31 U.S.C. § 3730(h)(1).

An FCA retaliation plaintiff has the initial burden to prove its prima facie case by establishing that (1) they engaged in a statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities. *Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota L.P.*, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022) (citation omitted). Then, "[i]f a defendant provides a legitimate, nondiscriminatory reason for termination in response to the plaintiff's prima facie showing, the plaintiff bears the burden of persuasion that the proffered reasons are pre-textual." *United States ex rel. Aquino v. Univ. of Miami*, 2018 WL 3814517, at *6 (S.D. Fla. Aug. 10, 2018) (citations omitted).

Even assuming that Schinnerer engaged in a protected activity, summary judgment is warranted because there is insufficient evidence of causation or pretext. In opposing Wellstar's Motion for Summary Judgment, Schinnerer relies on the temporal proximity between Wellstar's knowledge that he complained about the vendor selection process and him being placed on administrative leave and ultimately fired. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 12-15). Wellstar argues that Schinnerer's behavior towards his coworkers counts as an intervening act of misconduct that defeats any inference that can be discerned by that temporal proximity. (Def.'s Br. in Supp.

10

of Mot. for Summ. J., at 17-20). The Court agrees with Wellstar.

Under Eleventh Circuit precedent, "the but-for causation standard applies to False Claims Act retaliation claims." *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1360 (11th Cir. 2020) (citations omitted). "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). However, "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520 (11th Cir. 2007). For example, "there is no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening act of misconduct." *Brisk v. Shoreline Found., Inc.*, 654 F. App'x 415, 417 (11th Cir. 2016) (citation omitted). That intervening act of misconduct can occur before or after the plaintiff engaged in the alleged protected activity. *Nelson v. Americold Logistics, LLC*, 2020 WL 1809744, at *4 (N.D. Ga. Feb. 11, 2020), *report and recommendation adopted*, 2020 WL 1799945 (N.D. Ga. March 4, 2020) (collecting cases) ("In any event, it simply does not matter if Plaintiff engaged in protected conduct the day before or the day after his alleged misconduct. Either way, the misconduct defeats the inference of causation created by the temporal proximity between the protected conduct

11

and Plaintiff's termination." (footnote omitted)).

Additionally, to demonstrate that Wellstar's stated explanation is pretextual, the plaintiff must show "that there are such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gray v. City of Jacksonville, Fla.*, 492 F. App'x 1, 4 (11th Cir. 2012) (quotation marks and citation omitted). Furthermore, "[p]retext is only proven if it is shown both that the reason was false, and that…retaliation was the real reason behind the challenged action." *Brisk*, 654 F. App'x at 417 (citation omitted).

Here, Wellstar's stated basis for terminating Schinnerer's employment is as follows: "Although Damion has been repeatedly made aware over the last 12 months of concerns about his abrasive interactions with leadership, team members, and vendors, he continued to engage in such problematic behavior." (Exs. to Wellstar Deps., Ex. 14 at 4). Under Wellstar's employment policies, "[m]istreatment of a patient, visitor, volunteer or other employee" is a basis for termination. (*Id.*, Ex. 23 at 4). If Wellstar's belief that Schinnerer violated its policies was in good faith, the Court cannot infer that Schinnerer was terminated due to his complaints about the vendor selection process. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (affirming grant of summary judgment to employer who discharged employee based on good faith belief that she lied in an internal investigation).

12

Schinnerer provides several arguments as to why Wellstar's explanation of his termination was pretextual and not in good faith. First, he argues that he "was simply trying to do his job, but employees he worked with did not want to be critiqued and were not receptive to change." (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 17). But as Wellstar notes, "that Plaintiff was 'trying to do his job' does not require Defendant to allow him to mistreat other employees, much less suggest Defendant's basis for terminating his employment is false." (Reply Br. in Supp. of Mot. for Summ. J., at 11). Moreover, to the extent that there were differing views on whose attitude was to blame, "the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice." *Total Sys. Servs., Inc.*, 221 F.3d at 1176. As explained below, Schinnerer provides no reason to think that Wellstar's decision to believe his coworkers was dishonest.

Second, Schinnerer asserts that there were several employees who did not have issues with Schinnerer's behavior and Wellstar refused to interview them during its investigation. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 17-18, 21). Schinnerer specifically points to a statement by Ziglor that Human Resources did not interview individuals provided by Schinnerer because their statements would not have changed anything (*Id.*, at 21; Pl.'s Br. in Opp'n to Mot. for Summ. J., Ex. B ("Ziglor Dep.") at 52:21-53:12). However, Ziglor explained that "interviewing any additional people would not have changed the

13

fact of what these individuals saw, heard, or witnessed working with Damion or under his leadership." (Ziglor Dep. at 53:7-10). "So he could have been a good guy to them, but he was abrasive, rude, disruptive, to other people." (*Id.* at 53:10-12). Schinnerer points to nothing in Wellstar's employment policies that requires Wellstar to prove that an employee mistreated *all* other employees before discharging the offending employee. In fact, the policy is written in the singular, indicating that the mistreatment of *any* employee may lead to termination. (Exs. to Wellstar Deps., Ex. 23 at 4) ("Mistreatment of a patient, visitor, volunteer, or other employee"). Thus, the Court cannot infer from the refusal to interview the individuals Schinnerer provided that the investigation was done in bad faith.[5]

Schinnerer's third basis for arguing that he was not truly discharged for misconduct is a draft termination notice written in June 2021. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 18-20). Schinnerer asserts that "Braud prepared the first draft of the termination form specifically stating that Plaintiff's compliance complaints were the problem" and that "the evidence shows Plaintiff was only being 'abrasive' when complaining about compliance issues."

---

[5] At bottom, Schinnerer's contention is that the investigation into his behavior would have included these interviews if it were not a sham. However, this presumption is unfounded. For example, Harris was discharged for using profanity towards Schinnerer (and on this record did not engage in any protected activity). It stretches reason to presume that, if asked, Human Resources would have interviewed every person that Harris did not use profanity towards prior to terminating Harris's employment.

(*Id.* at 18-19). This mischaracterizes the evidence. The stated "performance deficiency" on the draft termination notice is:

> Abrasive interactions with leadership, team members, and vendors. Abusive behavior toward Biomed team members resulting in loss of trust and performance deficiencies within his team. Inability to drive constructive outcomes in managerial situations requiring cross-functional collaboration and engagement. Failure to properly execute duties related to AVP position – violation of Policy #3024.[6]

(Exs. to Wellstar Deps., Ex. 16 at 1). Nowhere in that description does it "specifically stat[e] that Plaintiff's compliance complaints were the problem," and the stated deficiencies are broader than complaints about compliance issues. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 18).

The only mention of Schinnerer's complaints is under the "specific details" section of the draft. (Exs. to Wellstar Deps., Ex. 16 at 1). However, the context of the document shows that this was not the problem with his employment. The paragraph discussing the complaints comes directly after a paragraph discussing Schinnerer's "deep knowledge" of the field and states that he "frequently questioned the competency and ethics of our Strategic Sourcing team." (*Id.*). It goes on to say that "[c]ertain elements he has called out…are valid and we have worked to address these issues." (*Id.*). "However, no evidence has been provided to support ethical or legal deficiencies regarding the actions of the Sourcing team," even though Schinnerer "cited discussions

---

[6] Policy #3024 is the Employee Corrective Action policy, which outlines discipline for various types of actions. (Exs. to Wellstar Deps., Ex. 23).

with various anonymous sources." (*Id.*). No reasonable inference can be drawn from these statements to demonstrate that his compliance complaints were the real reason he was discharged. Likewise, the decision to remove that language does not raise a reasonable inference of pretext or bad faith. The termination notice that was ultimately sent to Schinnerer on October 1, 2021, was significantly shorter than the draft and eliminated many details that were originally included. (*Compare id.* at 1-2 *with* Exs. to Wellstar Deps., Ex. 14 at 4). Thus, one cannot reasonably infer from the deletion of one particular detail (i.e., the compliance complaints) that it was part of an effort to cover up the real reason for terminating Schinnerer's employment.

Fourth, Schinnerer points to statements made by Ziglor and Braud to prove retaliatory intent. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 19-20). Ziglor stated in her deposition that part of the reason why there was a delay between putting Schinnerer on administrative leave and terminating his employment was the compliance investigation. (Ziglor Dep. at 12:12-22). Schinnerer argues that this shows that the decision to discharge him depended on whether his complaints were substantiated. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 19 n. 10). Yet, Ziglor went on to testify that Human Resources eventually terminated Schinnerer without knowing the results of the compliance investigation. (Ziglor Dep. at 14:10-16). As such, his termination could not have depended on the results of the investigation.

Schinnerer also asserts that Braud told him that "if you can't prove, you know, a crime is being committed, you need to let it go." (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 20). Schinnerer omits from his brief the rest of what Braud told Schinnerer: "if you think it's that big of a concern, you need to call the ethics line." (Schinnerer Dep. at 29:18-19). Far from demonstrating retaliatory intent, this statement shows that Braud encouraged Schinnerer to call the ethics line if Schinnerer believed what he was told. Thus, these statements are insufficient to create a genuine dispute of material fact.

Fifth, Schinnerer contends that Wellstar's bad faith is shown by its offer to give him a severance payment for resigning but revoking that offer if he insisted on further investigation. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 20-21). Schinnerer's contention assumes that if Wellstar truly believed Schinnerer's actions warranted termination then it would not have encouraged him to resign. (*Id.*). However, this assumption is unreasonable. There are multiple possible reasons for Wellstar offering Schinnerer severance pay to resign, such as saving resources by forgoing further investigation.[7] Schinnerer provides no factual basis from which a jury could reasonably infer that Wellstar's offer to let Schinnerer resign for a week's worth of pay meant that it was trying to strong-arm Schinnerer into accepting an unwarranted adverse employment action. Schinnerer's only attempt to do so is Braud's statement

---

[7] In that same vein, Schinnerer presumably does not believe that all plea agreement offers arise from inherently wrongful prosecution.

that further investigation would not prevent Schinnerer from being fired. (*Id.* at 20). This does not create a reasonable inference of bad faith since Braud knew the findings of the initial investigation and could opine that the already available evidence demonstrated a violation of Wellstar's policies warranting termination. Therefore, the offer to let Schinnerer resign does not create a genuine issue of material fact requiring denial of summary judgment.

Sixth, Schinnerer asserts that Wellstar failed to follow its disciplinary policies, thereby evincing retaliatory intent. (*Id.* at 21-22). More specifically, Schinnerer states that Wellstar failed to comply with its progressive discipline process. (*Id.*). Schinnerer is correct that "an employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (citations omitted). However, the Court can discern no deviation from Wellstar's standard procedures. Schinnerer's contention is premised on the fact that his behavior falls into less serious "Group I" violations. However, mistreatment of another employee is listed as a "Group II" violation, which does not require progressive discipline. (Exs. to Wellstar Deps., Ex. 23 at 4). The record shows an example of another employee being fired for mistreating another employee. Harris— who appears to have engaged in no protected activity—used profanity towards Schinnerer and was terminated without progressive discipline. Schinnerer attempts to distinguish Harris's termination by stating that he never used profanity towards a supervisor. (Pl.'s Br. in Opp'n to Mot. for Summ. J., at 22).

18

However, using profanity towards a supervisor is not the only way a person can mistreat a fellow employee. This distinction therefore does not show that mistreating another employee always requires progressive discipline under Wellstar's policy. Accordingly, the fact that Schinnerer never received progressive discipline does not establish pretext.

Finally, Schinnerer provides Michael McCullough and Denise Adams as comparators that were not discharged for their similar behavior. A plaintiff may show that a violation of a work rule was a pretextual basis for an adverse employment action if the plaintiff submits evidence that other employees who did not engage in protected activity were not treated similarly. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999). For such a comparison to be made, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1228 (11th Cir. 2019) (en banc) (quotation marks and citation omitted). A similarly situated comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28 (citations omitted).

McCullough and Adams do not meet these requirements. While they do share the same employment policies, they worked in different departments and reported to different supervisors. (Def.'s Br. in Supp. of Mot. to Dismiss, at 15). Moreover, the misconduct they are accused of is vastly different. While Adams was described as "passive-aggressive" and McCullough was described as "harsh" and "not fully listen[ing] or respect[ing] the voices of those who reported to him," Ange—one of Schinnerer's subordinates—said Schinnerer treated team members as "subhuman." (Braud Dep. at 58:9-60:10; Drummond-Dye Dep. at 48:18-49:4; Guydon Decl. ¶ 8).[8] Ange also stated that Schinnerer berated him on several occasions and did not report it due to intimidation and fear of retaliation by Schinnerer. (Def.'s Statement of Undisputed Material Facts ¶¶ 39-40). Several other Wellstar employees who interacted with Schinnerer told Human Resources that Schinnerer did not collaborate or get along with anyone, operated like a drill sergeant which caused team morale to be low, and was disagreeable, hostile, abrasive, aggressive, confrontational, and condescending. (*Id.* ¶¶ 31-35). In the Court's view, the complaints about McCullough and Adams are not nearly as severe or

---

[8] Schinnerer objects to the use of quotes provided by Biomed employees to Guydon during interviews as inadmissible hearsay. (*See, e.g.*, Pl.'s Response to Def.'s Statement of Undisputed Material Facts ¶ 26). However, since Wellstar need only show it had a good faith belief that Schinnerer engaged in misconduct and need not prove that he did in fact engage in misconduct, these statements are not offered for the truth of the matter asserted. Rather, the statements demonstrate the effect on the listener.

20

pervasive as these complaints are.

Moreover, Schinnerer was only terminated after the Harris investigation, when the full breadth of allegations came to light. Braud responded to the initial complaints about his harshness (which more closely resembled the complaints about McCullough and Adams) by talking to Schinnerer about the issue without taking formal action. (*Id.* ¶ 9). Schinnerer was treated similarly to McCullough and Adams until the complaints against him became significantly more serious and widespread. The Court therefore cannot conclude that Schinnerer was treated differently from any similarly situated comparators. Since none of Schinnerer's arguments provide a reasonable basis to conclude that Wellstar's non-retaliatory basis for terminating his employment was in bad faith or pretextual, the Court grants summary judgment to Wellstar on Count I.[9]

## B. COBRA Claim

Schinnerer also alleges that Wellstar did not timely send him his COBRA rights notification as required under 29 U.S.C. § 1166. (Second Am. Compl. ¶¶ 69-76). Regulations require that "the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals." 29 C.F.R.

---

[9] Because the Court concludes that summary judgment is warranted on the entire claim, the Court does not reach the issue of whether Schinnerer could seek emotional distress damages.

21

§ 2520.104b-1(b)(1). Wellstar asserts that it has done this because its third-party company timely sent the COBRA notifications through first-class mail. (Def.'s Br. in Supp. of Mot. for Summ. J., at 23-24; Fraser Decl. ¶ 6). The Court disagrees.

Wellstar relies on *DeBene v. BayCare Health Sys., Inc.*, 688 F. App'x 831, 838-40 (11th Cir. 2017) to support its position. There, the court found that the defendant-employer satisfied the notice requirement when there was undisputed evidence that it mailed the plaintiff a COBRA letter and when other intended recipients of letters mailed on the same day received the letters. While Schinnerer does not provide any evidence to dispute the fact that Wellstar sent the COBRA letter on October 12, 2021, this case is distinguishable from *DeBene*.

In *DeBene*, there was no issue of whether the employer mailed the letter to the wrong address. Here, after he was discharged, Schinnerer moved from his Marietta, Georgia address to his parents' Fort Worth, Texas address. Schinnerer did not have access to Wellstar's Human Resources system to update his address and was expected to notify his Human Resources representative directly. (Pl.'s Statement of Undisputed Material Facts ¶ 263). Schinnerer stated in his deposition that he notified Guydon of his new address around the end of August 2021. (*Id.* ¶ 266). Wellstar does not provide any evidence contradicting that statement. (Def.'s Response to Pl.'s Statement of Undisputed Material Facts ¶ 266). Yet, Schinnerer's COBRA letter was still

sent to his Marietta, Georgia address on October 12, 2021. (Def.'s Statement of Undisputed Material Facts ¶ 88). The Court cannot find as a matter of law that mailing the COBRA letter to the wrong address after being informed of the correct address months beforehand counts as "reasonably calculated to ensure actual receipt of the material." 29 C.F.R. § 2520.104b-1(b)(1). Therefore, summary judgment as to Count IV is denied.

## C. Conclusion

For the foregoing reasons, the Defendant Wellstar's Motion for Summary Judgment [Doc. 52] is GRANTED as to Count I and DENIED as to Count IV.

SO ORDERED, this ___7th___ day of February, 2024.

THOMAS W. THRASH, JR.
United States District Judge